# NEW YORK CITY *v.* PINE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 491. Argued February 25, 26, 1902.—Decided April 7, 1902.

The time at which a party appeals to a court of equity for relief affects largely the character of the relief which will be granted.

A failure to pursue statutory remedies is not always fatal to the rights of a party in possession, and if full and adequate compensation is made to the plaintiff, sometimes the possession of the defendant will not be disturbed.

A court of equity may take possession and finally end a controversy like the present by securing the payment of adequate compensation in lieu of a cessation of the trespass.

This was a suit commenced in the Circuit Court of the United States for the Southern District of New York by the appellees, as plaintiffs, for an injunction, restraining the city of New York from maintaining a dam on the West Branch of Byram River and diverting the waters thereof from their natural flow through the farms of plaintiffs.

The facts are these: Byram River is a non-navigable stream of fresh water flowing into Long Island Sound. Tracing its source up stream from the Sound, for a short distance it forms the boundary between New York and Connecticut, then deflects to the east, and for some five or six miles is within the

State of Connecticut. It there divides into two branches, the east branch being entirely within the limits of that State. The west branch, which is the longer of the two, extends into the State of New York. A few hundred feet from the state line the city of New York, under legislative sanction, commenced the construction of a dam, with a view of appropriating part or all of the waters of this west branch and using the same for the supply of the city. The watershed of this west branch above the dam, the territory from which the water sought to be appropriated is all drawn, is wholly within the limits of the State of New York. The plaintiffs own farms situated on Byram River in Connecticut, below the junction of the two branches. In their bill they alleged, among other things:

"Fourth. Your orators further aver that the defendant began about two years ago the building of a dam across the said West Branch of said Byram River, about five hundred feet north of the Connecticut line, and is now building said dam and it is now near completion, and your orators are informed and believe that the said defendant intends to divert or cause to be diverted the water of said West Branch or some of it from the natural channel thereof, and intends to divert or cause the same to be diverted from flowing through its natural channel into and through the State of Connecticut, and by, through and over land owned by your orators.

"Fifth. Your orators further aver that they as riparian owners of land in the State of Connecticut, on said Byram River or on the West Branch thereof, are each of them accustomed to use the water of said river, . . . and that the flow of said river would be materially lessened by the diversion of the water of the said West Branch or any part thereof, and that they, your orators, and each of them, would be damaged in the sum of twenty-four hundred dollars ($2400) and more."

The answer of the city admitted the building of the dam, although averring that it was not near completion, and would not prevent the natural flow of the West Branch for at least a year; admitted its intention to appropriate some or all of the water; alleged that such appropriation would cause little or no injury or damage to the plaintiffs, and denied on information

and belief that the premises of either would be damaged in the sum of twenty-four hundred dollars; averred that the building of the dam was of great and permanent benefit to the citizens and residents of New York, and that it was and always had been able and willing to pay any damages that the complainants might suffer from being deprived of the natural flow of the water. Testimony was taken and the case submitted to the court upon pleadings and proofs. That the dam as completed, and it was completed when the testimony was taken, would work a diversion of a considerable portion of the water in its natural flow, and that the property of plaintiffs was damaged by such diversion, was shown by the testimony and found by the court, although whether such damage amounted to more than twenty-four hundred dollars each was perhaps not established by the testimony, and certainly was not found by the court. The cost of the dam proper was about $45,000, though the city had expended for land and damages several hundred thousand dollars. It also appeared that several thousand people in the city of New York were dependent upon this water supply. The Circuit Court, after finding the fact of damage, held that a court of equity had no power to ascertain and order the payment of damages, but that it might delay the issue of an injunction so as to give the parties an opportunity to agree in respect to the amount of compensation, and in an opinion, filed on June 27, 1900, ruled that a decree would be entered on November 1, 1900, if the parties had not come to an agreement. Thereafter, no agreement having been made, a decree was entered as follows:

"That the complainants in this suit and each of them are entitled to the injunction order of this court restraining the defendant, its successors and assigns, their and its officers, agents and employés, each, all and any of them, from diverting the water or any part of the water of the West Branch of the Byram River or any part of the water of the Byram River, or in preventing in any way said water or any part thereof at any time from flowing through its natural channel, before, at and below the junction of the two branches of said river; and

"It is further ordered, adjudged and decreed that the defend-

ant, its successors and assigns, their and its officers, agents and employés, each, any and all of them, be and they and each of them are hereby perpetually enjoined from diverting the water or any part of the water of the West Branch of the Byram River, or any part of the water of the Byram River, or in preventing in any way said water or any part thereof at any time from flowing through its natural channel, before, at and below the junction of the two branches of said river."

On appeal to the Circuit Court of Appeals for the Second Circuit this decree was, on October 30, 1901, affirmed by a divided court. Thereupon the case was brought here by certiorari. 183 U. S. 700.

*Mr. George L. Rives* for New York. *Mr. George L. Sterling* was on his brief.

*Mr. Charles C. Marshall* for Pine. *Mr. Stephan G. Williams* was on his brief.

MR. JUSTICE BREWER, after making the above statement, delivered the opinion of the court.

Many interesting questions are involved in this case, but we think it unnecessary for the present at least to decide more than one. We assume, without deciding, that, as found by the Circuit Court, the plaintiffs will suffer substantial damage by the proposed diversion of the water of the West Branch. Also, without deciding, we assume that, although the West Branch above the dam and all the sources of supply of water to that branch are within the limits of the State of New York, it has no power to appropriate such water or prevent its natural flow through its accustomed channel into the State of Connecticut; that the plaintiffs have a legal right to the natural flow of the water through their farms in the State of Connecticut and cannot be deprived of that right by and for the benefit of the city of New York by any legal proceedings either in Connecticut or New York; and that a court of equity, at the instance of the plaintiffs, at the inception and before any action had been

taken by the city of New York, would have restrained all interference with such natural flow of the water.

Notwithstanding these assumptions we are of opinion that the decree ought not to stand, and for these reasons: This is not a case between two individuals in which is involved simply the pecuniary interests of the respective parties. On the one side are two individuals claiming that their property rights are infringed—rights which can be measured in money, and that not a large sum; on the other, a municipality undertaking a large work with a view of supplying many of its citizens with one of the necessities of life. According to the averments in the bill the city had been engaged in this work for two years and had nearly completed the dam. While the near completion is denied in the answer there is no denial of the time during which the city had been engaged in the work, and it stands as an admitted fact that for two years prior to the commencement of this suit the work had been under way. It is true the testimony discloses that the plaintiffs and the city had been trying to agree upon the amount of compensation, but that shows that the plaintiffs were seeking compensation for the injuries they would sustain, and were not insisting upon their alleged right to an abandonment of the work. It is one thing to state a right and proffer a waiver thereof for compensation and an entirely different thing to state the same right and demand that it should be respected. In the latter case the defendant acts at his peril. In the former he may well assume that payment of a just compensation will be accepted in lieu of the right. In the latter the plaintiff holds out the single question of the validity and extent of the right; in the former he presents the right as the foundation of a claim for compensation, and his threat to enforce the right if compensation is not made is simply a club to compel payment of the sum he deems the measure of his damages. Further, the testimony shows that the city was settling with other parties similarly situated, and paying out large sums of money for the damages such parties would sustain. So, it is not strange that the city acted on the assumption that the only matter to be determined was the amount of the compensation.

If the plaintiffs had intended to insist upon the strict legal rights (which for the purposes of this case we assume they possessed), they should have commenced at once, and before the city had gone to expense, to restrain any work by it. It would be inequitable to permit them to carry on negotiations with a view to compensation until the city had gone to such great expense, and then, failing to agree upon the compensation, fall back upon the alleged absolute right to prevent the work. If they had intended to rest upon such right and had commenced proceedings at once, the city might have concluded to abandon the proposed undertaking and seek its water supplies in some other direction. If this injunction is permitted to stand the city must pay whatever the plaintiffs see fit to demand, however extortionate that demand may be, or else abandon the work and lose the money it has expended. While we do not mean to intimate that the plaintiffs would make an extortionate demand, we do hold that equity will not place them in a position where they can enforce one.

The time at which parties invoke the aid of a court of equity is often a significant factor in determining the extent of their rights. *Vigilantibus non dormientibus æquitas subvenit* is a maxim of equity. As said by Pomeroy, in his work on Equity Jurisprudence, vol. 1, sec. 418, the principle embodied in this maxim " operates throughout the entire remedial portion of equity jurisprudence, but rather as furnishing a most important rule controlling and restraining the courts in the administration of all kinds of relief, than as being the source of any particular and distinctive doctrines of the jurisprudence. . . . The principle thus used as a practical rule controlling and restricting the award of reliefs is designed to promote diligence on the part of suitors."

In *Smith* v. *Clay*, 3 Brown Ch. 639, note, Lord Camden said: " A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith and *reasonable diligence.*"

It was said by Circuit Judge Shipman, in deciding this case:

"If a court of equity has power in any case by decree to ascertain and order the payment of damages by decree of injunction in the alternative, a court of equity will not exercise such power where the defendant has committed a permanent injury without authority of law and without pretense of right to take and retain the property."

However true that proposition may be generally when invoked at the inception and before any work has been done, we think it not applicable when the plaintiffs have waited until the work has been progressing for two years and the defendant has expended a large sum of money thereon. As declared by Lord Camden, in the quotation just made, a court of equity is never active in relief against public convenience.

It may be not amiss to notice some of the cases in which the effect of time upon a suit in equity has been the subject of discussion. In *Galliher* v. *Cadwell*, 145 U. S. 368, was considered the general subject of laches. Many authorities were cited and reviewed, and it was said (p. 373):

"But it is unnecessary to multiply cases. They all proceed upon the theory that laches is not like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties."

In *Roberts* v. *Northern Pacific Railroad*, 158 U. S. 1, it appeared that Douglas County, Wisconsin, had agreed with the Northern Pacific Railroad Company to deed to it certain lands, held by the county under tax titles, in consideration of the construction by the company of its railroad through the county. The company constructed the road and the county made the deed. Thereafter the validity of such deed was questioned, and the county made a conveyance of the lands to Roberts *et al.*, whereupon the railroad company brought suit against them to quiet its title. The line of the road was constructed through some of these lands, and Mr. Justice Shiras, speaking for the court, observed (pp. 9, 10, 11):

"So far as those portions of the lands, described in the bill

of complaint, consist of parcels held and used by the railway company for the necessary and useful purposes of their road as a public highway, it is obvious that the title and possession thereof cannot be successfully assailed by the appellants. The latter became purchasers long after the railroad company had entered into visible and notorious possession of these portions of the lands and had constructed the roads, wharves and other improvements called for by their contract with the county.

"It is well settled that where a railroad company, having the power of eminent domain, has entered into actual possession of land necessary for its corporate purposes, whether with or without the consent of the owner of such lands, a subsequent vendee of the latter takes the land subject to the burthen of the railroad, and the right to payment from the railroad company, if it entered by virtue of an agreement to pay, or to damages, if the entry was unauthorized, belongs to the owner at the time the railroad company took possession. . . . So, too, it has been frequently held that if a landowner, knowing that a railroad company has entered upon his land, and is engaged in constructing its road without having complied with the statute requiring either payment by agreement or proceedings to condemn, remains inactive and permits them to go on and expend large sums in the work, he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and be restricted to a suit for damages. *Lexington & Ohio Railroad* v. *Ormsby,* 7 Dana, 276; *Harlow* v. *Marquette &c. Railroad,* 41 Mich. 336; *Cairo & Fulton Railroad* v. *Turner,* 31 Ark. 494; *Pettibone* v. *La Crosse & Milwaukee Railroad,* 14 Wis. 443; *Chicago & Alton Railroad* v. *Goodwin,* 111 Ill. 273."

Again, *Penn Mutual Life Insurance Co.* v. *Austin,* 168 U. S. 685, was a suit to perpetually restrain the city of Austin from completing a system of waterworks, and from levying on the property of the Austin Water, Light and Power Company any taxes to pay therefor, and it was held that by reason of the delay in pressing their claim, the plaintiffs were not entitled to the relief, and many authorities were cited in the opinion in support thereof.

In *Northern Pacific Railroad Co.* v. *Smith*, 171 U. S. 260, was presented a question similar to that in *Roberts* v. *Northern Pacific Railroad*, *supra*, and the same conclusion was reached. In the course of the opinion, *Provolt* v. *Chicago, Rock Island & Pacific Railroad*, 57 Missouri, 256, 264, was cited. That was a case in which the conduct of a landowner in standing by while a railroad company constructed its road precluded him from recovering physical possession of the land covered thereby, and this quotation was made from the opinion of that court:

" If, from negotiation in regard to the price of the land, or for any other reason, there is just ground of inference that the works have been constructed with the express or implied assent of the landowner, it would seem wholly at variance with the expectations of the parties and the reason of the case, that the landowner should retain the right to enter upon the land, or to maintain ejectment. There are other effective and sufficient remedies. A court of equity would unquestionably interfere, if necessary, and place the road in the hands of a receiver until the damages were paid from the earnings. 2 Redf. Am. Railw. Cas. 2d ed. 353. But the only question we are called upon to decide is whether under all the facts and circumstances of this case ejectment will lie, and we think it will not."

This question was also considered in *Charleston Railway Co.* v. *Hughes*, 105 Georgia, 1; and in the course of the opinion on page 15 are these pertinent observations by Mr. Justice Cobb:

" When a railroad company, without warrant or authority, enters upon the land of another, it is as a general rule no less a trespasser than any other person who is guilty of an act of a similar nature. If, however, a railroad company enters upon the land with the consent of the owner, or under license from him, and the property thus taken possession of becomes such a necessary component part of its railroad that to surrender its possession would interfere seriously with the interests of the company, the landowner, although entitled to compensation for his property, might by his conduct in allowing the entry upon his land and permitting the company to so use it as that it could not be abandoned without great prejudice to its rights,

estop himself from asserting against the company the legal title to the property by an action of ejectment. The propositions above stated are simply the application of familiar principles of law which govern in all transactions of the character above referred to, whether the controversy be between natural persons alone, or between such persons and corporations, and whether the corporation be public or private. A railroad corporation, being one charged by the law with the performance of certain duties to the public, is allowed, under some circumstances, to set up rights connected with the land over which it operates its line or railway, of which an individual or an ordinary private corporation would not generally be allowed to avail itself. Controversies in reference to possession of land, where the rights of individuals only are involved, are purely matters of private concern. Controversies in which a corporation charged with the duties incumbent upon carriers of passengers, freight and mails, in which an effort is made by private individuals or others to take away from such corporation a part of the property in its possession, which is absolutely essential to its complete performance of the public duties required of it, become matters of more than private concern, and in which the public is deeply and seriously interested. For this reason it has become settled law that the harsh remedies which would be allowed to one individual against another in reference to the possession of land will not be allowed to one who is seeking to recover such property from a railroad company, when exact justice can be done to such owner by giving him remedies which are less severe in their nature, and by which he would secure substantially the same rights, thereby saving to the public the right to require a performance of the public duties incumbent upon the corporation whose property is the subject matter of the controversy. That a railroad corporation has a right to deprive a person of his property for its uses by doing acts which in an individual would be dealt with as a trespass is not contended for; but when a railroad company enters upon land and constructs its road without lawful authority, and the landowner acquiesces in the wrongful act and the consequent appropriation of the property to a great

public use until the same has become a necessary component part of the property required by the railroad to perform its public duties, such landowner will be held to have waived his right to retake the property, and will be remitted to such other remedies for the wrong done him as will not interfere with the rights of the public to have the railroad maintained and operated."

See also *Atlanta, Knoxville & Northern Railway Company* v. *Barker*, 105 Georgia, 534; *Chicago, Burlington & Quincy Railroad Company* v. *Englehart*, 57 Neb. 444.

From these authorities it is apparent that the time at which a party appeals to a court of equity for relief affects largely the character of the relief which will be granted. If one, aware of the situation, believes he has certain legal rights, and desires to insist upon them, he should do so promptly. If by his declarations or conduct he leads the other party to believe that he does not propose to rest upon such rights but is willing to waive them for a just compensation, and the other party proceeds to great expense in the expectation that payment of a fair compensation will be accepted and the right waived—especially if it is in respect to a matter which will largely affect the public convenience and welfare—a court of equity may properly refuse to enforce those rights, and, in the absence of an agreement for compensation, compel him to submit the determination of the amount thereof to an impartial tribunal.

These views do not justify the conclusion that a court of equity assumes a general right to ignore or supersede statutory provisions for the ascertainment of the amount of compensation in cases of condemnation. They simply mean that a failure to pursue statutory remedies is not always fatal to the rights of a party in possession, and that sometimes if full and adequate compensation is made to the plaintiff the possession of the defendant will not be disturbed.

It is true the cases cited were mainly those of actual physical possession by railroad companies of real estate belonging to other parties, but the same doctrine applies when there is only an invasion of some easement or other incorporeal right, and its preservation can alone be secured in a court of equity. The

action of the court does not depend upon the character of the property or right involved but upon the conduct of the plaintiff in respect to his claim. *Pappenheim* v. *Metropolitan Elevated Railway Co.*, 128 N. Y. 436, was a suit brought by the owner of premises on Second avenue, in New York city, to restrain the defendants from operating their elevated railway in front of plaintiff's premises. The trial court found the amount of the damage to the premises, and provided by its decree that an injunction should not issue in case the defendants paid the amount of the damage upon the execution by plaintiff of a deed conveying her interest in the easement taken. This decree was affirmed by the Court of Appeals, and in the opinion by Mr. Justice Peckham, then a member of that court, it was said, after referring to the rule controlling actions at law :

"But the owner may resort to equity for the purpose of enjoining the continuance of the trespass, and to thus prevent a multiplicity of actions at law to recover damages ; and in such an action the court may determine the amount of damage which the owner would sustain if the trespass were permanently continued, and it may provide that, upon payment of that sum; the plaintiff shall give a deed or convey the right to the defendant, and it will refuse an injunction when the defendant is willing to pay upon the receipt of a conveyance. The court does not adjudge that the defendant shall pay such sum and that the plaintiff shall so convey. It provides that, if the conveyance is made and the money paid, no injunction shall issue. If defendant refuses to pay, the injunction issues." p. 444.

It is true in that case the plaintiff sought in her petition the very relief that was granted, and so the case is not authority on the question of the effect of delay in asserting one's legal rights, but it is authority for the proposition that a court of equity may take full possession and finally end the controversy by securing the payment of adequate compensation in lieu of a cessation of the trespass. See, also, *Jackson* v. *Stevenson*, 156 Mass. 496, 502.

It is, however, urged that in all the cases referred to the one party could have appropriated the property or right of the other by condemnation proceedings, and that as he could have done

so he should not be disturbed for lack of those proceedings, but either given time to carry them through, or else in the pending equitable suit have the compensation or damages estimated and then, upon payment, be protected in his possession. In other words, as he could have obtained the rightful possession by legal proceedings and payment, equity will do what the law could have done, and on payment of the ascertained compensation or damages affirm the possession. Whatever may be true of those cases, we start in this with the assumption that there was no power in the city of New York, by any proceedings in the States of New York or Connecticut, to acquire the right of appropriating this water and thus depriving the plaintiffs of its continued flow. It was suggested in the *Pappenheim* case, *supra*, that "in cases where the owner wishes to actually stop the further trespass, and where the defendant has no legal right to acquire the property, such condition would not be inserted, and an injunction would issue upon the right of the owner being determined. *Henderson v. Central Railroad Co.*, 78 N. Y. 423."

But the ruling of this court has been to the contrary, at least in cases where there has been delay on the part of the plaintiff in commencing suit. In *Osborne v. Missouri Pacific Railway Company*, 147 U. S. 248, the plaintiff, owning lots on Gratiot street, in St. Louis, filed a bill in the United States Circuit Court for the Eastern District of Missouri, to restrain the defendants from constructing a steam railroad along such street. The fee of the street was in the public, but it was alleged that the construction and operation of the railroad would work a damage to the property of the plaintiff's, and the facts tending to show such damage were set forth. It appeared that the road had been constructed before the bill was filed. Section 21 of article 2 of the Missouri constitution of 1875 reads "that private property shall not be taken, or damaged, for public use without just compensation." The statutes of Missouri provided means for condemning a right of way and assessing the value of property taken, but contained no provision for assessing the damages to property not taken, so that neither the railroad company nor the plaintiff could at the time have taken any legal proceedings for ascertaining the amount of the damage

to plaintiff's property by the construction of the railroad. The Circuit Court, finding that the plaintiff's property was damaged, and assuming that the damages came within the protecting clause of the constitution, held that nevertheless the plaintiff was not entitled to an injunction, saying (35 Fed. Rep, 84, 85):

"The question at issue is whether a complainant, who claims damages resulting incidentally to his property from the laying of a railroad track in a public street under a legislative and municipal license, can wait until the work is done, and then enjoin its operation, although none of his property is actually taken, or whether he should in such case be left to his remedy at law for the damage inflicted?' Unless the wrongdoer is insolvent, or unless some other cause exists to render the legal remedy of no avail, it appears to me that on general principles he should be left to his legal remedy, and it was so held in the cases first above cited. The rule does not deprive the complainant of the protection intended to be afforded by the constitution, nor does it work any hardship. It simply requires the complainant to be diligent in applying for such relief as equity may afford."

That decision was affirmed by this court, and in the opinion it was said (p. 259):

"But where there is no direct taking of the estate itself, in whole or in part, and the injury complained of is the inflicting of damage in respect to the complete enjoyment thereof, a court of equity must be satisfied that the threatened damage is substantial and the remedy at law in fact inadequate before restraint will be laid upon the progress of a public work."

Reference was made in the opinion to *McElroy* v. *Kansas City*, 21 Fed. Rep. 257, a case in the Circuit Court of the United States for the Western District of Missouri, in which the same constitutional provision was in question, and an application made to restrain the grading of a street in front of the complainant's lot, and in which, as stated, "it was ruled that, if the injury which the complainant would sustain from the act sought to be enjoined could be fully and easily compensated, at law, while, on the other hand, the defendant would suffer great damage, and especially if the public would suffer

large inconveniencè if the contemplated act were restrained, . the injunction should be refused, and the complainant be remitted to his action for damages. If the defendant had an ultimate right to do the act sought to be restrained, but only upon some condition precedent, and compliance with the condition was within the power of the defendant, the injunction would almost universally be granted until the condition was complied with; but if the ·means of complying with the condi-' tion were not at defendant's command, then the court would adjust its order so as to give complainant the substantial benefit of the condition, while not restraining defendant from the exercise of its ultimate rights."

These propositions do not, as counsel for appellees suggest, necessitate some legislation like the act of Parliament known as Lord Cairn's act, 21 and 22 Victoria, June 28, 1858, chap. 27, by which it was provided that " in all cases in which the Court of Chancery has jurisdiction to entertain an application for an injunction against a breach of any covenant, contract or agreement or against the commission or continuance of any wrongful act or for the specific performance of any covenant, contract or agreement it shall be lawful for the same court, if it shall think fit, to award damages to the party injured either in addition to or in substitution for such injunction or specific performance, and such damages may be assessed in such manner as the court shall direct."

Nor do they justify the conclusion that under their application one man is at liberty to wrong another upon payment of damages. There is no thought of creating a new rule or of substituting a judicial opinion for an act of Congress. All that can be fairly said in reference to them is that they are an application of the ancient maxim that he who seeks equity must do equity. Limiting them, as we have limited them in the present case, to conditions which exist after defendant has proceeded in the completion of its proposed work and has expended a large sum of money therein, they can never be considered as inviting a party to do a wrong with the expectation of escaping every penalty save a pecuniary one.

On that ground alone, and without deciding whether plain-

tiffs have a legal right to recover damages, the decrees of the
Circuit Court of Appeals and the Circuit Court will be reversed
and the case remanded to the latter court, with instructions to
set aside its decree and to enter one providing for an ascertain-
ment, in the way courts of equity are accustomed to proceed, of
the damages, if any, which the plaintiffs will suffer by the con-
struction of the dam and the appriopriation of the water, and for
which the defendant is legally responsible, a proposition upon
which we express no opinion, and fixing a time within which
the defendant will be required to pay such sum, and that upon
the failure to make such payment an injunction will issue as
prayed for; and, on the other hand, that upon payment a de-
cree will be entered in favor of the defendant.   If the plaintiffs
shall prefer to have their damages assessed by a jury, leave may
be given to dismiss the bill without prejudice to an action at law.

*Reversed.*

Mr. Justice Gray did not hear the argument and took no
part in the decision of this case.