ANDRUS v. BERKSHIRE POWER CO.

(Circuit Court of Appeals, Second Circuit. June 16, 1906.)

No. 279.

1. WATERS AND WATER COURSES—FLOWING LANDS—ELECTION OF REMEDIES—INJUNCTION—ESTOPPEL.

Complainant, a riparian proprietor, on being approached by defendant's agents prior to the construction of a dam by defendants in the river below complainant's property, made no objection to the erection of the dam, but refused to discuss the amount of the damages he would demand for injuries to his property by backwater until after the dam had been erected and the damages actually sustained could be ascertained. Defendant completed the dam without any protest on complainant's part, or seasonable or definite notice that complainant intended to enjoin the construction of the dam, until defendants had refused to pay complainant's demand for $5,000 damages, made a year after the original conversation between complainant and defendant's agents, after which complainant filed the bill for injunction and damages. *Held*, that complainant's acts amounted to an election to accept redress for the overflow of his land by an award of damages, and he was therefore not entitled to an injunction.

2. INJUNCTION—DENIAL—BILL—RETENTION TO AWARD DAMAGES.

Where, in a suit to restrain the flowing of complainant's land by the construction of a dam, complainant was not entitled to an injunction, but was entitled to maintain a bill in equity for the assessment of damages on the theory of a continuing trespass, it was error for the court to dismiss the bill on denying an injunction; complainant at his election being entitled to have the case referred to a master for the assessment of damages.

Appeal from the Circuit Court of the United States for the District of Connecticut.

Appeal from a decree dismissing upon final hearing bill for injunction. The opinion of the court below is reported in 145 Fed. 47.

Walter Artz, for appellant.

Henry Stoddard, for appellee.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. Complainant is a resident of Massachusetts, and owns a dairy farm which borders on the Housatonic river in said state. Defendant is a Connecticut corporation, and under authority conferred by its charter has built in Connecticut a dam across said river, and is using the water power thus obtained for supplying electric light and power to the inhabitants of various towns in the state of Connecticut, and in furnishing light for streets and public buildings in said town. Said dam has caused the water of the river to set back on complainant's farm, flooding and undersoaking it and stopping the drainage of a considerable portion of his meadow land.

Prior to the incorporation of the defendant, one Roraback, then its promoter and now its president, called upon complainant in reference to the proposed dam. He told complainant that he was inter-

ested in the proposition to build such a dam, and, according to his testimony, explained to complainant the proposed height of the dam, and said that he had secured rights for the flowage of property below complainant's house, and that it was his judgment and that of the engineers that the property of complainant would not be damaged, but that he "desired to be on the safe side, and, rather than go ahead and take chances on the matter, I wished to ascertain from Mr. Andrus whether, if something should happen which we were not looking for and his property should be damaged, whether he would be willing to take up the settlement of damages with us." He testified that complainant said he did not see how the dam could damage his property, but he thought the proper way would be to wait and see, and that he then asked complainant whether he meant by this he would be willing to take damages for his property if it were injured, and complainant said he would, and that they talked over together the way in which such damages were assessed.

Eddy, another witness for defendant, testified that he had a conversation with complainant after the dam was built, in which complainant told him that Roraback, in the original interview, had suggested that in case of a disagreement over damages, if there should prove to be any, the matter might be adjusted by leaving it to arbitration, and that at complainant's request he (Eddy) explained to complainant the usual method of appointing arbitrators.

On several occasions, after the construction of the dam, conferences were held between complainant and defendant's agent as to the amount of damages, in the course of which complainant took defendant's agents over the property, explained fully the various items of damage, stated in a general way his estimate of damages, and fixed a definite figure at which he would settle, and, finally, after the dam was completed and a year had elapsed since the first interview, complainant told Roraback:

"I would rather he would take the water off my farm than to take any price."

All the testimony in the case was taken in open court. The court held that the conduct of complainant was such that he ought not to be permitted to obtain an injunction against the maintenance of the dam, and dismissed the bill. Assuming that the court below would have properly exercised its discretion in refusing, upon the foregoing evidence, the extraordinary relief prayed for, the question here presented is whether such discretion was properly exercised, in view of the evidence introduced by complainant.

By virtue of the provisions of the statute of frauds an easement cannot be created in lands by parol, and even a parol license, not coupled with an interest, to do particular acts on land is ordinarily revocable, because otherwise it would be within the prohibition of the statute. Therefore the complainant should not be denied an injunction against the undisturbed enjoyment of his land, without clear proof of such facts as would disentitle him to such relief in a court of equity. If, however, it conclusively appears that complainant failed season-

ably to assert his claim to relief by injunction, and expressed a willingness to accept such damages as he could obtain in an action at law or under the ordinary procedure in equity, and deliberately consented to forego any claim for damages until the dam had been built and his actual damages ascertained, he ought to be held to the consequences of such conduct, and it would be inconsistent with such an understanding to permit him to cause the dam to be removed by a mandatory injunction.

In the determination of the questions raised, we have eliminated the testimony of witnesses for defendant, so far as it is contradicted or qualified by complainant, and have not taken into account the fact that the finding of the court below was based upon the testimony of witnesses produced before the judge, where he had an opportunity to observe their demeanor and to test their credibility. The material portions of the testimony of complainant as to his original conversation with defendant's agent Roraback are as follows:

"[Roraback] said he came up through the neighborhood calling on the farmers in the interest of the dam that they was contempla.ing putting up down the river, and wanted to know what I thought about it. Well, I told Mr. Roraback that I hadn't had occasion to think much about it; in fact, I didn't know much about it. I had heard they was going to put up one, and he said to me that the water he didn't think would damage me, because the engineers, I think he said, had ascertained that the water would not be raised above two inches higher than it was at the bridge that was near Beebe's—what is called the 'Bartholomew Bridge.' And he said that rise of the water would run out up somewhere near the Blodgett Bridge; that is, the railroad bridge where my crossroad comes out on the highway up the stream over a mile from the other bridge. I replied that we couldn't tell; we would have to wait and see, meaning that we would wait to see when the water was raised, that we couldn't tell then where it would come. I think that is all the conversation on that matter we had. I know it was."

In his affidavit on application for a preliminary injunction, complainant had omitted the statement which he testified he thought defendant's agent made about the engineers having ascertained "that the water would not be raised above two inches higher than it was at the bridge." This omission was called to his attention on cross-examination, but was not satisfactorily explained.

Complainant's subsequent attitude and action in regard to the matter of damages, according to his testimony, is as follows: After the dam had been built, Eddy, one of defendant's agents, came to look over the damaged land, and complainant—whose "object was to show him what the damage was as near as I could; that was the most we talked about"—went over the land with Eddy, and asked him "if he had the power to settle the damage if I gave him the damage," and "told him I guess there would be no use telling him if he couldn't settle it." Complainant then said as follows:

"I told Mr. Eddy that I thought that the power company ought to close up their dam, raise their flashboards, and make that dam tight to hold the water and keep it there until it filled up. set the water back all they could for a few days, so that the people could see what they had to contend with. That was my idea. We were in the dark, and didn't know how much flood we were going to have, how much rise, or anything about it, really, where it

would come to or stop; and I thought it would be a good plan to close it up, set the water up there so that we could see what we had got to contend with."

Eddy testified as follows as to his conversation with complainant—that complainant said:

"Mr. Roraback came to his [complainant's] house and informed him that the erection of the dam was in contemplation, but he didn't think it would affect Mr. Andrus's land, but that if it did affect his land he wanted to assure Mr. Andrus that he or his company would see that Mr. Andrus's damages were paid, and, furthermore, he said that Mr. Roraback had at that time suggested that in case of disagreement over the damages, if there should prove to be any, the matter might be adjusted by leaving it to arbitration, and either on that occasion or on my next visit, I can't be positive which, Mr. Andrus asked me further about the method of appointing arbitrators, and I explained to him the usual method of appointing them. That is all that I recall on that line."

Complainant was not recalled in rebuttal to deny or qualify the testimony of Roraback, nor that of Eddy, quoted above, confirming Roraback both as to the original conversation and as to complainant's agreement to accept damages, if there should prove to be any. On the undisputed facts and on complainant's own testimony as to his conversations with Eddy and Roraback, the situation of the parties was as follows: Before the organization of the defendant corporation, Roraback, representing the parties in interest or acting as its promoter, undertook to ascertain from the farmers, whose property was likely to be affected if the proposed dam were built, what action they would take in the matter, and to make agreements with them as to prospective damages. He called on complainant, and stated that he did not think the dam would damage complainant, but wanted to know what he thought about it, and complainant said:

"We couldn't tell; we would have to wait and see, meaning that we would wait to see when the water was raised, that we couldn't tell then where it would come."

Roraback had blanks for the proposed agreements with him; but, in view of complainant's refusal to express any opinion and insistence on waiting to see what the amount of rise would be after the dam was built, Roraback was prevented from making an agreement, and without any intimation of objection he was invited to go forward in the way suggested by complainant and to build the dam and then and thereby ascertain the damage. Accordingly, after the organization and incorporation of defendant, it went on with the construction of the dam, and completed it without any protest on the part of complainant, and without any seasonable or definite notice of complainant's intention to claim any extraordinary remedy by way of injunction, but, on the other hand, if the uncontradicted testimony of Eddy is to be believed, with an admission of an understanding with Roraback, and an expectation on the part of defendant, that complainant would accept money compensation for such money damages as he might find he had suffered. It was not until defendant had refused to pay complainant's demand of $5,000 damages, made a year after the original conversation and long after the dam was completed, that

complainant intimated that he would take any measures which would interfere with the maintenance of the dam. The bill was filed one year and six weeks after said original conversation.

It is to be borne in mind that there is in this case no evidence of fraud or misrepresentation on the part of defendant's agent Roraback. There is no evidence to contradict his statement that his opinion as to damage was based upon statements made to him by his engineers or upon information derived from other sources. In fact, he was prevented from testifying as to whether he relied in any respect upon the topographical maps of the locality made by the government, by the objection made by complainant's counsel to the question and its exclusion by the court. The complainant was originally entitled to assert his property rights either by a bill for an injunction against a threatened trespass or by an action at law for damages after the trespass was committed. When defendant's promoter called on him and stated its plans, complainant had the right either to elect which course he would pursue or to refuse to make such election. In the latter event, if he had told defendant that if it erected the dam without his consent it must do so at its own risk, or that if damage resulted he would bring proceedings to enjoin the maintenance of the dam, there would have been no question as to the equity of his present position. But, by reason of his original insistence that "we would wait and see, meaning that we would wait and see when the water was raised," so that the damages might be ascertained by having the dam built, by his failure to object to the building of the dam, by his subsequent conversations and conduct in reference to the amount of damages, and by his delay in asserting any right inconsistent with a claim of compensation in money for damages, we think he may properly be held to have invited or licensed the defendant to proceed with the building of the dam, and to have elected to use this method of ascertaining what the damages would be. And, as defendant has acted under said invitation or license, and now stands ready to pay all lawful damages thus ascertained, it would be contrary to equity and good conscience to set the machinery of the court in motion to redress the grievances now claimed, by a revocation of the license and a destruction of the property created under the license at an expense of more than $100,000, when the complainant, by his original conduct and subsequent laches and apparent acquiescence, has induced or permitted defendant to believe that he would not interfere with the maintenance of the dam provided his just damages were paid.

In reaching this conclusion it is not necessary to invoke the application of the doctrine of estoppel, or of waiver, or even of an irrevocable license, although in many well-considered cases it is asserted that such a parol license cannot be revoked by injunction after the licensee has expended money and labor in pursuance of the license. "There is also considerable support for the doctrine that the permission to flow after it has been acted upon may be enforced in equity on the same ground on which the courts of equity enforce parol contracts for the sale of land after there has been partial performance. Says Judge Redfield: 'If such a license be given by parol, and expense in-

curred on the faith of it, so that the parties cannot now be placed in statu quo, there would seem to be the same reason why a court of equity should grant relief as in any other case of part performance of a parol contract for the sale of land or any interest therein; i. e., to prevent fraud.' In Pennsylvania it has been explicitly held that 'expending money or labor in consequence of a license to divert a water course, or use a water power in a particular way, has the effect of turning such license into an agreement that will be enforced in equity'; and the decision, as appears by the context, and also by subsequent cases, is not based upon any distinction between licenses which are to extinguish and those which are to create an easement or servitude, but is applicable to both. The same doctrine is held in Indiana. * * * But it may well be said that in any case of a parol contract relating to lands it is the particular right or privilege promised that the parties have in view, rather than the means or instrument by which it is to be created or given, and the court will only be adapting the proper means to the end at which the parties aimed, if it shall direct a legal assurance to be executed. If relief be given by awarding a perpetual injunction against disturbing the enjoyment of the license, the same end would be reached and the licensor at the same time would only be held to the exact terms of his promise." Cooley on Torts, 365, 366, 367. See, also, McBroom v. Thompson (Or.) 37 Pac. 57, 42 Am. St. Rep. 806.

The complainant has come into a court of equity asking for the extraordinary remedy of injunction. This remedy is not given ex debito justitiæ. It is one which is granted or withheld in the sound discretion of the court, in view of all the circumstances of the particular case. "It should be remarked, however, that in those cases in which the questions of nuisance or no nuisance have been raised in a court of equity, the conclusion of the court to grant or deny relief in the particular cases is not always a guide to a court of law when it comes to pass upon similar facts. The relief which equity gives by way of injunction is so severe in its consequences that it is never granted except upon a case clearly and conclusively made out. To break up a man's business in a case of doubt, or even of slight inconvenience, would be an abuse of power. The court of equity wisely and justly, in such cases, declines to interfere, and sends the plaintiff to a court of law for damages." Cooley on Torts, 710, 711.

We conclude, therefore, that the court below exercised a sound discretion in refusing the injunction. In holding that the application for this injunction should be denied, we do not wish to be understood as suggesting any limitation upon complainant's right to obtain adequate damages for this trespass by any appropriate proceedings in a court of equity, or by one or more actions at law, for such trespasses upon his property rights as have been or may be hereafter committed by reason of the erection and continued maintenance of the dam.

The principles announced and applied in the opinion of the Supreme Court in New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 16 L. Ed. 820, are controlling upon us in the disposition of this case. There, as here, the defendant had no power to appropriate property in an ad-

joining state, and a court of equity at the inception of the trespass, at the instance of complainant, would have interfered by injunction. There, too, the contest was between the demands of public service, and the rights of a private individual which could be measured in money, and suit was not brought until after the work had proceeded for a long period, in that case for two years. The court said as follows:

"It is true the testimony discloses that the plaintiffs and the city have been trying to agree upon the amount of compensation, but that shows that the plaintiffs were seeking compensation for the injuries they would sustain, and were not insisting upon their alleged right to an abandonment of the work. It is one thing to state a right and proffer a waiver thereof for compensation and an entirely different thing to state the same right and demand that it should be respected. In the latter case the defendant acts at his peril; in the former he may well assume that payment of a just compensation will be accepted in lieu of the right. In the latter the plaintiff holds out the single question of the validity and extent of the right; in the former he presents the right as the foundation of a claim for compensation, and his threat to enforce the right if compensation is not made is simply a club to compel payment of the sum he deems the measure of his damages. Further, the testimony shows that the city was settling with other parties similarly situated, and paying out large sums of money for the damages such parties would sustain. So it is not strange that the city acted on the assumption that the only matter to be determined was the amount of the compensation. If the plaintiffs had intended to insist upon the strict legal rights (which for the purposes of this case we assume they possessed), they should have commenced at once, and before the city had gone to expense, to restrain any work by it. It would be inequitable to permit them to carry on negotiations with a view to compensation until the city had gone to such great expense, and then, failing to agree upon the compensation, fall back upon the alleged absolute right to prevent the work. If they had intended to rest upon such right and had commenced proceedings at once, the city might have concluded to abandon the proposed undertaking and seek its water supplies in some other direction. If this injunction is permitted to stand, the city must pay whatever the plaintiffs see fit to demand, however extortionate that demand may be, or else abandon the work and lose the money it has expended. While we do not mean to intimate that the plaintiffs would make an extortionate demand, we do hold that equity will not place them in a position where they can enforce one."

Counsel for complainant has attempted to distinguish this case, especially in view of the greater period of delay lasting for two years. But we think this is immaterial, in view of the fact that over a year elapsed between complainant's invitation to defendant to build the dam and experiment as to the amount of damages, and the filing of the bill. Defendant's words and acts and failure to act in this case, as fully pointed out, furnish a much stronger argument against the interference of a court of equity than that presented in New York City v. Pine.

The decree of the court below may be reversed, and the cause remanded to the court below, with instructions to the court to set aside its decree and enter one providing for an ascertainment, in the way courts of equity are accustomed to proceed, of the damages to which complainant may be entitled by reason of the construction, maintenance, and use of the dam complained of, and fixing the time within which defendant will be required to pay such damages, and

providing for the issuance of the injunction prayed for upon failure of defendant to pay the same, and that upon such payment a decree be entered in favor of defendant, or, at the option of complainant, the decree below may be affirmed, with costs, without prejudice to complainant's rights to bring an action at law for said damages.