### WEST & CO. v. OCTORARO WATER CO.

(Circuit Court, E. D. Pennsylvania. January 29, 1908.)

No. 30, October Term, 1905.

1. JUDGMENT—CONCLUSIVENESS—ISSUES.

Where proceedings by defendant water company to condemn all the water of a stream for public use as against complainants, lower riparian proprietors owning a mill on the stream in another state, were dismissed on the ground that the state's right of eminent domain had no extraterritorial force, and that the compensation to be awarded for the taking of complainants' rights could not be determined in a state in which they did not reside, such judgment of dismissal was not conclusive against defendant's right to take a fair proportion of the stream for public use which was not in issue in a prior suit.

2. EMINENT DOMAIN—REMEDIES OF OWNERS OF PROPERTY—INTERSTATE WATERS AND WATER COURSES—INJUNCTION—LACHES.

Defendant was incorporated in July, 1903, under the laws of Pennsylvania to furnish water for public purposes with the right of eminent domain, and on July 24th decided to appropriate the whole of a stream on which complainants, who were lower riparian proprietors, operated a paper mill in Maryland by water power from such stream. In October, 1903, complainants were aware of defendant's intent to appropriate water from the stream, and employed an attorney to protect their rights. He at first insisted that defendant should either desist from its intent to take water from the stream or purchase complainants' plant at a specified price. Defendant declined either, but offered to pay complainants $5,000 for the privilege of taking five to six million gallons daily which was declined. Nothing was done until January, 1904, when complainants' counsel threatened an injunction, but finally admitted that this would be dissolved on the filing of a bond to pay damages sustained, it being then agreed that 60 days' notice should be given before defendant began to pump. This notice was given in December, 1904, but nothing further was done until June, 1905, when defendant attempted to condemn complainants' rights which proceeding was dismissed April 14, 1906, prior

to which, on January 6, 1906, complainants, by new counsel, filed a bill to restrain the diversion of the water from the stream, defendants in the meantime having made large expenditures in the furtherance of their undertaking. *Held*, that complainants were barred by laches from insisting on their right to restrain defendant's appropriation of so much of the stream as had been taken, and were at most only entitled to compensation for the damages sustained.

3. EQUITY—BILL—RETENTION.

Where, in a suit to restrain an upper riparian proprietor from withdrawing water from a stream, it was held that complainants were barred by laches from objecting to such withdrawal, and were only entitled to damages for the injury sustained, compensation will be allowed according to the water so far taken, the bill being retained as a pending case so that further compensation might be awarded in case of a further taking thereafter.

In Equity.

W. H. Surratt and L. L. Smith, for complainants.

Joseph T. Bunting and John G. Johnson, for defendants.

ARCHBALD, District Judge.[1]  This is a bill brought by the complainants, who are citizens of Maryland, and owners there of a paper mill operated by water power developed from the Octoraro creek, to restrain the defendants, a Pennsylvania corporation, from diverting the waters of the stream. The Octoraro creek rises in the hills of Lancaster and Chester counties, Pa., and flows southerly into Maryland, emptying into the Susquehanna river about a mile below the complainants' mill. The stream drains an extended area of 216 square miles, 180 of which are in Pennsylvania, 151 of these being above the point at which the defendant company has located its Pine Grove pumping station, and 23 square miles being above the pumping station at McCrea's Mills, on the west branch. The company was incorporated in July, 1903, under the laws of Pennsylvania, by the merger and consolidation of seven other companies, which had been similarly incorporated for the purpose of supplying water to the public in different townships of the two counties named, each of these companies being vested with the power of eminent domain, and the consolidated company, by statute, having the combined powers of all. The stream, with its several branches, is practically the only one available to the water company, and by resolution July 24, 1903, it decided to appropriate the whole of it, in line with which, by agreement with the Pennsylvania Railroad Company, the only customer which it so far has, it has contracted to deliver 60,000,000 gallons of water daily for the next 15 years. At present, however, its equipment falls far short of that, the capacity of the Pine Grove dam, being but 43,000,000 gallons, and the pumping station there, which is run by water power, being able to pump but 1,200,000 gallons daily from the stream, while the dam at McCrea's Mills has a holding capacity of but 1,000,000 gallons, and the pumping station, with one of its two sets of pumps working, is able to take but 3,000,000 gallons daily, these two stations in actual results, thus so far diverting from the stream not to exceed 3,200,000 gallons in every 24 hours. The only other reservoir is that at Mars Hill, with a capacity of 10,-

[1] Specially assigned.

000,000 gallons, but other property has already been acquired by the company with a view to provide for increased storage; and with a change from water to steam power at Pine Grove—56 gallons of water going down the stream in order to raise 1—there is a possibility there of an immense increase. The general average flow of the stream at the complainants' mill is variously estimated at from 100,000,000, to 200,000,000 gallons daily, and the average minimum flow, during the dry season, at some 15,000,000 or 20,000,000. This according to the complainants' proofs, is capable of developing 348 horse power, to which extent wheels have been installed by them, for the use of their plant. But according to the defendants, this is an over-installation, only 184 horse power being able to be safely or profitably relied on, which at times will go down to as low as 77 or 78, the quantity of water at present being taken from the stream by the defendants amounting to but 9 of 10 horse power. The complainants are not asking for damages to compensate for this diversion. They deny the right of the defendants, notwithstanding their charter, which, as it is said, has no extraterritorial force, to any use of the water other than that of an ordinary riparian owner, and assert their right to have it come down to them unimpaired. The defendants concede that they cannot appropriate the whole stream, nor divert more than a fair proportion of it; but this they claim the right to do, by virtue of their charter from the state of Pennsylvania, within the bounds of which over three-quarters of the watershed lies, professing a willingness to make compensation to the complainants for any damages which they may suffer, which they contend are not large.

The questions which are so presented are novel and important, but it will not be necessary to go into them, in view of others by which the disposition of the case is controlled. It is charged by the defendants that the complainants are estopped by laches from asking more than to be compensated for the water taken; and on the other hand, it is claimed by the complainants that the defendants are concluded by the result of certain condemnation proceedings, instituted in the common pleas of Lancaster county, in which it was decided that they had no right as against the complainants to divert any of the waters of this stream. Either of these, if sustained, is decisive of the case, and they are consequently to be first discussed.

The charge of laches is based on the delay for over two years to file the present bill, during which large expenditures by the defendants were being made, and negotiations for a settlement were entered into. It appears, as to this, that as early as October, 1903, the complainants were aware that the defendants intended to take water from this stream, in consequence of which they retained Mr. W. U. Hensel of Lancaster, Pa., to protect their interests, who in November following notified Mr. Bunting, the defendants' counsel, that unless a settlement was effected with them, or their rights were otherwise protected, an injunction would be applied for by his clients. This, after some further correspondence, resulted in an interview December 18, 1903, at which Mr. Huey, representing the defendant company, made the proposition to pay the complainants $5,000, on the basis of taking 5,000,000 or 6,000,000 gallons daily from the stream. He said they were not going to .

take much, "a mere drop in the bucket," as he expressed it, amounting to but 10 horse power, which, out of the 350 which the complainants claimed to have developed at their works, he said would not be felt. The pumping station at McCrea's Mills, as he explained, had only 22 square miles of the watershed above it, and the one at Pine Grove only three-quarters of the whole drainage area, pointing out that, as the latter was to be operated by water power, there would always be a considerable quantity going down the stream, which would be ample most of the year except in a very dry season. The response of the complainants was that they wanted to be let alone, and that the only proposition which they would entertain, was to buy them out entirely, putting the value of their property at $250,000, which Mr. Huey said was out of the question. No agreement was thus reached at this meeting, nor at others which followed a few days later, each party adhering to the position originally advanced, the complainants expressing a willingness to sell at the price named, and the defendants offering to pay $5,000, on the basis of taking 6,000,000 gallons daily, with the understanding that when more was taken there would be further compensation. The matter drifted along in this shape some six months further, the defendants in the meantime, in May, 1904, having completed the work which they had undertaken at the McCrea's Mills station. Anticipating, in view of this, that the company would soon begin pumping, Mr. Hensel, in January, 1904, again called attention to the fact that no provision had been made for the protection of his clients, and notified the defendants that he should have to proceed for an injunction, unless this was promptly remedied. This led to further correspondence between counsel for the respective parties, in which it was asserted by counsel for the defendants that, as the company had the right of eminent domain, and the taking was in Pennsylvania, the only redress, even for owners of property upon the stream in Maryland, was by condemnation proceedings, and the assessment of damages by viewers or a jury in the courts of Pennsylvania; to which view, after some demur, Mr. Hensel finally assented, conceding that an injunction, if obtained, would be dissolved upon a bond being filed to pay the damages sustained; and it was thereupon stipulated that 60 days' notice should be given by the water company before beginning to pump, in order to afford the complainants the requisite opportunity to protect themselves; of all of which the complainants were advised by their counsel. Notice of a contemplated pumping was accordingly given in September, 1904, in prospect, no doubt, of the completion of the Mars Hill reservoir, which occurred soon afterwards in October, a start on the Pine Grove dam having also been made in August. Notwithstanding this, however, there was again an interval of inaction, nothing being done to bring the matter to a head, until June, 1905, when the defendants filed and had approved, by the common pleas of Lancaster county, a bond with proper surety in the sum of $1,000, conditioned for the payment to the complainants of the damages they would sustain by reason of the appropriation of the water of the stream. To this, objections were filed on behalf of the complainants: (1) That the bond was inadequate; (2) that, as against the complainants, the defendants had no right to take the water; and (3) that the court had no authority to ap-

prove the bond or entertain the proceedings, the parties, and interests affected, not being in the state of Pennsylvania. The contention that the court had no jurisdiction in the premises, the right to appropriate under the power of eminent domain being limited by state lines, was ultimately sustained April 14, 1906, and the approval of the bond which had been entered was stricken off. Octoraro Water Company's Petition, 15 Pa. Dist. R. 767. But in the meantime, on January 6, 1906, under the guidance of new counsel, the present bill was filed.

There was nothing adjudicated in the condemnation proceedings referred to which concludes the issues here. The water company there, pursuing the remedy given by the statute, sought to have assessed the damages which the complainants would be compelled to take in exchange for their property in the stream. This the court held that it could not do, the company having no right to appropriate the water of the stream as against parties beyond the borders of the state. The complainants, in other words, could not be drawn into the common pleas of Lancaster county to have the compensation for their property compulsorily fixed, as for a lawful taking under the power of eminent domain, the authority in that regard, conferred by the state law, having no extraterritorial force. The right to go into that question must be conceded (Philadelphia Street Railway's Petition, 203 Pa. 354, 53 Atl. 191; Katharine Water Co., 32 Pa. Super. Ct. 94), and the soundness of the views expressed is beyond doubt; that is to say, so far as concerns the authority of the water company to take whatever part of the stream it chose, the manifest intention, as expressed in its resolution, being to take it all. But the right of the company, representing the state and vested to that extent with its sovereign powers, to take a fair proportion of the stream for the use of the public, was not in issue, and was not discussed, nor was the question of the complainants' laches, by which, whatever might have been originally insisted on, it is claimed that they are now estopped. These are the questions, which are presented here, and being distinctly different in principle and effect and not having been passed upon or involved in the decision made, they must be regarded as reserved, and not barred by anything that was there ruled.

Turning then to the subject of the complainants' laches, it is no doubt true that the mere delay to bring suit for two years, after it was known that the defendants intended to take water from the stream, is not enough of itself to estop them at this time. There must be something besides that, which makes it inequitable that they should now proceed. Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; London Bank v. Dexter Horton & Co., 126 Fed. 593, 61 C. C. A. 515. This is said to be found in the fact that the complainants not only stood by and allowed the defendants to make large expenditures, in building dams, installing pumping stations, buying rights of way, and laying water mains, but that they actually entered into negotiations, with the defendants, as to a money compensation to be paid. It is claimed, however, on the other hand, that consistently denying from the first the authority of the defendants to appropriate any of the stream the complainants have asserted their right and desire to be let alone, confirmatory of which it is pointed out that, at the two inter-

views which were had early in the controversy, they rejected the offers of settlement which were made, and insisted that the purchase of their plant by which they would be eliminated as a factor was the only proposition which would be entertained. Nor, as it is contended, are the defendants shown to have done or abstained from doing anything on the strength of the inaction charged, the plans which they had made in the beginning having been carried out as they were originally formed. But the case is not so simple, either way, as that. It is no doubt true, that the defendants have gone on with their work, apparently unaffected by the attitude of the complainants towards it, but it is at the same time to be borne in mind that the complainants early in the controversy allowed themselves to be drawn into negotiations looking to a money settlement, if indeed they did not seek them, after which it can hardly be asserted that the defendants were not in fact misled. Nor have the complainants consistently maintained to the end the right to have the stream flow unimpaired. This position may have been taken at the start, but in the letters which passed between counsel in the summer of 1904, when a material part of the defendants' outlays were still unmade, it was conceded by Mr. Hensel, as we have seen, that the water company had the right to take by virtue of the power of eminent domain, and that the injunction to prevent it would be dissolved, if obtained, upon the forthcoming of a bond to secure the damages sustained. Later on, it may be, that he expressed a somewhat different opinion, the complainants having become restive under this advice. But in the meantime the mischief had been done, and the ground lost could not be regained. Nor can it be said that he had no authority to surrender their rights, and that they are not bound by what he said. Mr. Hensel was careful to notify them of all that he had done, and having knowledge of it, without dissent, they are not in a position to repudiate it at this time.

Assuming, then, that if the complainants had moved promptly when first threatened they would have been entitled to assert rigidly their right to the undiminished flow of the stream, it is too late to do so now, in view of all that has occurred. Not only has there been the delay shown, during which the defendants were known to be proceeding with their work, in which large expenditures have been made which cannot be recalled, but negotiating for a money settlement, whether for much or little, as they did, and even though they held out against the offers made, insisting on the purchase of their mills as the only thing to which they would accede, having committed themselves to an adjustment which would leave the defendants in the undisturbed possession of the stream they cannot turn around now and insist that everything should be put back as it originally was. As said by Mr. Justice Brewer in New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820:

"It is one thing to state a right and proffer a waiver thereto for compensation, and an entirely different thing to state the same right and demand that it should be respected. In the latter case the defendant acts at his peril. In the former he may well assume that payment of a just compensation will be accepted in lieu of the right."

And when to this is added the concession of counsel, with the knowledge of the complainants, while a material part of the defendants' outlays were still unmade, that the water company had the right to take the water under the power of eminent domain conferred by the Pennsylvania laws, and that all that could be asked by his clients was to be secured in the damages which they had sustained, it is clear that the defendants are entitled to be protected in what they have done meanwhile, and that the complainants are estopped from demanding more than to be compensated, as so conceded, at this time.

That a lower riparian owner can be barred by laches in this way from contesting the right of another to take under circumstances such as these was expressly decided in New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, just referred to, and is not open to question here. It is true that in that case the water was appropriated by a municipality in order to supply its citizens with one of the necessities of life, while here, although ostensibly incorporated for the same purpose, the only customer of the defendant water company so far is the Pennsylvania Railroad, for whose sole benefit it apparently exists. But while the public character of the taking may emphasize, it is not the basis of, nor does it affect the principle involved. The point is that, whatever in this regard may be the fact, if there is any lack of authority in the parties to take, they are entitled to have it promptly challenged before any extended expenditures have been made, after which, and after being led to believe that no extreme rights will be insisted on, it would be inequitable to allow it to be done. Again quoting from New York City v. Pine:

"If one aware of the situation believes he has certain legal rights, and desires to insist upon them, he should do so promptly. If by his declarations or conduct he leads the other party to believe that he does not propose to rest upon such rights, but is willing to waive them for a just compensation, and the other party proceeds to great expense in the expectation that payment of a fair compensation will be accepted and the right waived—especially if it is in respect to a matter which will largely affect the public convenience and welfare—a court of equity may properly refuse to enforce those rights, and, in the absence of an agreement for compensation, compel him to submit the determination of the amount thereof to an impartial tribunal."

With this conclusion reached, the difficulties in the case disappear. It is no longer necessary to determine the respective rights of the parties to the water of this stream, flowing as it does through different states; nor whether as against a lower riparian owner in the one, authority to take a fair proportion, if not the whole of it, for a public use can be conferred by the state where it takes its rise. Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956. All that is decided is that the complainants under the circumstances which have been disclosed must accept what has been so far done, being remitted, as the full measure of relief to which they are now entitled, to a money compensation for the property rights impaired or destroyed. That is not to say that the defendants can go on and make a still further inroad upon this stream, much less, that they can take it all, as they have resolved. As yet they have stopped with the resolution, without any further overt act. When they do more, the questions which are now left in abeyance will revive in their original force, and to avoid the

necessity for a new suit, if a new and additional taking should be essayed, the bill will be retained as a pending case to meet it. But in the meantime it will be left to a master to fix the compensation due to the complainants for the damages which they have sustained, the question of costs being deferred until the coming in of his report. Let a decree to this effect be drawn by counsel.