### HAGERLA v. MISSISSIPPI RIVER POWER CO.

(District Court, S. D. Iowa, E. D. February 3, 1913.)

No. 277.

1. NAVIGABLE WATERS (§ 36*)—TITLE AND RIGHTS OF RIPARIAN OWNERS.

Under the law of Iowa, a riparian owner on a navigable stream owns the fee only to high-water mark, while the state in its sovereign capacity holds title to the soil below in trust for navigation and commerce and other public uses. It has been the policy of the state for many years to permit such riparian owners to build structures from their boundaries into the stream for use in connection with navigation and commerce.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

2. FRANCHISES (§ 15*)—FORFEITURE—CONDITIONS SUBSEQUENT.

Conditions subsequent are never self-forfeiting, and the failure of a corporation to perform the conditions of a grant from the state within the time limited does not forfeit its grant without action by the state, and in no event can its right be questioned by an individual.

[Ed. Note.—For other cases, see Franchises, Dec. Dig. § 15.*]

3. EMINENT DOMAIN (§ 288*)—ACTION BY LANDOWNER—LACHES.

A landowner, whose land would be flooded by a projected dam across the Mississippi, who took no action until after the corporation building the dam had expended millions of dollars in the work and in the purchase of other lands similarly situated, but negotiated for the sale of his own land and awaited the action of a sheriff's jury in condemnation proceedings, is estopped by laches from then questioning the power of the company to build the dam or to exercise the power of eminent domain.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 783–788; Dec. Dig. § 288.*]

4. REMOVAL OF CAUSES (§ 106*)—REMAND—WAIVER OF RIGHT.

Where a removed cause was one within the general jurisdiction of the federal court, and after complainant's motion to remand had been overruled he joined in a stipulation, filed additional pleadings, and set the case down for hearing on bill and answer, the question of defendant's right to remove cannot be again raised.

[Ed. Note.—For other cases, see Removal of Causes, Cent. Dig. § 216; Dec. Dig. § 106.*]

5. NAVIGABLE WATERS (§ 22*)—CONSTRUCTION OF STATUTE—"ASSENT" DEFINED.

Act Feb. 9, 1905, c. 566, 33 Stat. 712, "granting to the Keokuk & Hamilton Water Power Company rights to construct and maintain * * * a dam across the Mississippi river," provides, in section 1, that "the assent of Congress is hereby given" to such company to construct the dam. Held, that the word "assent" as so used was equivalent in meaning to the word "authorize."

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 100–120, 132; Dec. Dig. § 22.*

For other definitions, see Words and Phrases, vol. 1, pp. 545–547.]

6. CONSTITUTIONAL LAW (§ 130*)—EMINENT DOMAIN—DELEGATION OF POWER —FOREIGN CORPORATION—CONTRACT RIGHT.

Where a foreign corporation by complying with the laws of a state acquires the right under such laws to exercise the power of eminent

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

domain in the state and expends money on the project to which the exercise of such power is essential, it has a contract right to exercise it which is protected from impairment by the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 301; Dec. Dig. § 130.*]

7. EMINENT DOMAIN (§ 10*)—DELEGATION OF POWER—FOREIGN CORPORATION.
   A corporation, although without the power of eminent domain in the state of its creation, may exercise such power in another state if vested therewith by the statutes of such state.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 35-48; Dec. Dig. § 10.*]

8. EMINENT DOMAIN (§ 10*)—DELEGATION OF POWER—FOREIGN CORPORATIONS —PUBLIC USE.
   Code Iowa 1897, § 1990, authorizes any corporation organized for the purpose of utilizing any water power within the state or of any stream lying upon the borders thereof to condemn such lands as may be necessary for its plant under the power of eminent domain, and section 1637 et seq. authorizes foreign corporations on compliance with their provisions to come into the state with all the rights of domestic corporations. *Held*, that a foreign corporation complying with such provisions, which was authorized by its charter and also by act of Congress (Act Feb. 9, 1905, c. 566, 33 Stat. 712) to build a dam across the Mississippi river at a rapids, in aid of navigation, and also to utilize the water power to generate electricity to be transported and used in different states, had power to condemn land which would necessarily be overflowed by its dam; such flowing constituting a taking for a public use.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 35-48; Dec. Dig. § 10.*]

9. EMINENT DOMAIN (§ 10*)—DELEGATION OF POWER—EXCEPTION OF "MANU-FACTURING" CORPORATIONS.
   A corporation organized to engage in the business of generating electrical power, to be sold to others, is not a "manufacturing" corporation within the meaning of a statute excepting such corporations from those developing water power on which it confers the right of eminent domain.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 35-48; Dec. Dig. § 10.*

   For other definitions, see Words and Phrases, vol. 5, pp. 4346-4358.]

10. NAVIGABLE WATERS (§ 22*)—MISSISSIPPI RIVER—IMPROVEMENT OF NAVI-GATION—POWER OF CONGRESS.
    Congress has supreme authority as to plans and methods of improving navigation on the Mississippi river, and whether it appropriates money from the treasury for the construction of a dam and lock to enable vessels to pass rapids, or whether it authorizes a corporation to build such improvements and permits it to use the water power created thereby to generate electricity to be distributed and sold in adjoining states to compensate for the public improvement, its action is equally beyond the control of the courts.

    [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 100-120, 132; Dec. Dig. § 22.*]

In Equity. Bill by Albert Hagerla against the Mississippi River Power Company. Hearing on bill and answer. Decree for defendant. See, also, 202 Fed. 771.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Felix T. Hughes, of Keokuk, Iowa, and Ernest McCoid, of Keokuk, Iowa, for complainant.

W. E. Blake, of Burlington, Iowa, George B. Stewart, of Ft. Madison, Iowa, J. O. Boyd, of Keokuk, Iowa, and Hazen I. Sawyer, of Keokuk, Iowa, for defendant.

SMITH McPHERSON, District Judge.  This case presents the question as to whether the above-named Power Company, in constructing a dam across the Mississippi river, has the power of eminent domain.  The case was set down by Hagerla for hearing on bill and answer.  The rule in such a case is:

(1) All facts well pleaded in the bill and not denied must be taken as true.  Allegations denied are taken as untrue.

(2) Affirmative recitals pleaded in the answer and germane to the bill will be taken as true.

(3) Mere conclusions, either of fact or law, whether in the bill or answer, will be disregarded.

(4) Facts of which courts take judicial notice will be considered, although not pleaded by either party.

The Keokuk & Hamilton Water Power Company, a corporation created under the laws of Illinois, was empowered to develop and utilize the water power of the Des Moines rapids in the Mississippi river, with power to construct a dam and other improvements as may be necessary to create and utilize such water power and to rent and sell power, and to carry on and conduct all business enterprises by which water power and its products may be directly or indirectly used.  That company was licensed and authorized to do business in Iowa.  Later on the Congress of the United States enacted a statute entitled:

"An act granting to the Keokuk & Hamilton Water Power Company rights to construct and maintain for the improvement of navigation and development of water power a dam across the Mississippi river."

This act was approved February 9, 1905 (33 Stat. 712, c. 566). Section 1 provides:

"That the assent of Congress is hereby given to the Keokuk & Hamilton Water Power Company, * * * its successors, and assigns, to erect * * * a dam *. * * across the Mississippi river at * * * the foot of the Des Moines rapids, from Keokuk, Iowa, to Hamilton, Illinois, and to construct, operate and maintain power stations * * * in connection with the said dam, with suitable accessories for the development of water power, and the generation, use, and transmission * * * of electric energy. * * *"

The statute provides that, in lieu of the three locks and the dry dock now owned by the government, the company shall build, in connection with the dam, at places designated by the Secretary of War, a lock and dry dock to accommodate the traffic on the river.  The Secretary of War was empowered to approve the plans for the dam, lock, dry dock, and appurtenant works, and all said works should be constructed under the supervision of an army officer designated by the Secretary of War.

The company was required to pay all persons for lands thus taken, overflowed, or damaged by the construction and operation of the said works, and the general government was not to be liable for any dam-

ages or for any part of the costs of said works. But when completed to the satisfaction of the Secretary of War, the United States should have the ownership and control of the lock, dry dock, and appurtenances, and operate and maintain the same. The company was further required to provide, in connection with said improvements, a suitable power plant for operating and lighting the lock, dry dock, and appurtenances, under specifications approved by the Secretary of War. The company was required to commence said improvements within five years from the date of the approval of the statute, and complete the same within ten years from said date. The Keokuk & Hamilton Water Power Company commenced the construction of said improvements on January 8, 1910.

The Des Moines rapids of the Mississippi river are 11½ miles in length, with a fall of 22.68 feet, by reason whereof there can be no navigation on the river in low or ordinary stages of the water. In the interest of navigation, more than 30 years ago, after an expenditure of many millions of dollars, the government completed a canal on the Iowa side around said rapids, with a depth of 5 feet, and in which there is a dry dock and three locks. But such canal and locks have long since become inadequate for the navigation and for the commerce. The government is put to an annual expense of a large sum for the operation and maintenance of said canal and dry dock and the three locks. When the dam in question is completed, the government canal, locks, and dry dock will be submerged in water and rendered useless.

The dam will have a length of 4,278 feet, or practically four-fifths of a mile. The base of the dam will be 42 feet wide, and the top 29 feet wide, with a height of 53 feet. In the dam are 119 arches, in which are as many spillways and gates, the use of which are to provide a constant level of water above the dam. At the foot of the rapids on the Iowa side is the city of Keokuk, opposite which is the city of Hamilton, Ill. In the dam will be a lock 400 feet in length and 110 feet in width, inside measurements, with a lift of 40 feet, through which all boats can be carried to or from the river below and the water above as formed by the dam. The dam will back the water up, or form a pool, as far to the north as the city of Burlington, something like 60 miles distant. Between the thread of the river and the Iowa shore there is to be a power house built in the bed of the river. The foundation of this power house is 26 feet deep in the rock bed, 1,800 feet in length, and 266 feet in width. The power house itself will be 1,718 feet long, 135 feet wide, and 144 feet high. On the Iowa side there is to be a dry dock of sufficient capacity to dock any river vessel therein, so that the water can be drawn off and vessels repaired. The river at the point in question runs from north to south. The dam proper extends from the Illinois shore to the northeast corner of the power house; the power house lengthwise being from north to south. Between the southwest corner of the power house and the Iowa shore is the dry dock, and adjoining on the west of the dry dock is the Iowa shore. Protection is given against floating ice and driftwood from getting into the turbines. The dam and the locks, power house and

dry dock, arches and spillways, as well as foundations, are all to be built of concrete formed from crushed rock, sand, water, and cement, and, when completed, all said improvements and structures will comprise one structure of solid concrete from the Illinois to the Iowa shore. The power house is to be equipped with 30 turbines each furnishing 10,000 horse power at the works, the revolutions of which will be 57.7 per minute, with an efficiency of 86 per cent.

After the Keokuk & Hamilton Company had proceeded with the work until February, 1911, it assigned and conveyed its rights to the Mississippi River Power Company, a corporation created and existing under the laws of the state of Maine. That company is still prosecuting the work, which will be completed within a few months. It has already entered into a contract for the furnishing of 60,000 horse power of electric energy for a term of 99 years, to be delivered to parties in the city of St. Louis, approximately 135 miles distant. It proposes to furnish the remainder of the power to parties at cities in the states of Iowa, Illinois, and Missouri, but it does not propose to use any of this power for its own uses other than in the operation of its power house in connection with the power for lighting the same and for operating the locks and the dry dock. The capacity of the dam at the points of delivery at St. Louis and elsewhere will equal at least 200,000 horse power.

Hagerla, a citizen of Iowa, owns, on the bottoms on the Iowa side of the river, 35 miles distant from the dam, 220 acres of land, a part of which all the time, and at times the whole thereof, will be submerged by reason of the pool formed by the dam and gates. The Power Company has bought and paid for, at an expense of more than $1,000,000, more than 600 farms; all to be thus submerged, with the exception of Hagerla's and six others. Hagerla and the company were unable to agree as to the valuation to be placed on his land. Thereupon the Power Company, under title 10 of chapter 3 of the Iowa Code, 1897, filed its petition praying for the appointment of a commission, or jury of six men, to fix the valuation of Hagerla's land. Hagerla was given timely notice of the time and place of hearing. This proceeding resulted in an award in favor of Hagerla of $7,816.60. From that award Hagerla appealed to the district court of Lee county, Iowa, asking that the award be increased to $20,000. The company at once deposited with the sheriff of the county the amount of the award and the costs. In the district court of Lee county, Hagerla filed a pleading, coupled with which was a cross-bill in equity, by which he challenged the constitutional right of the Power Company to thus take his land for any sum. Thereupon the company, a defendant as to said cross-bill, obtained an order to remove the case to this court. Thereafter Hagerla filed a motion in this court to remand the case to the state court, and that motion was denied.

Thereafter Hagerla filed a stipulation as to pleading, and then filed an elaborate bill of complaint in equity asking that the Power Company be enjoined from overflowing his land, and, coupled with the prayer, prays for a writ of injunction on final hearing, and for general equitable relief. Later Hagerla filed a motion to dismiss his cross-

bill, and still later by writing withdrew his motion. To that bill of complaint the Power Company filed an answer. Since then each party has filed amendments to pleadings; and it is upon that bill of complaint and answer, each as amended, that the case has been set down for hearing on Hagerla's motion, and is now to be determined by this court. There are other facts to be stated later.

[1] Hagerla contends that from the thread of the stream to high-water mark, the title to both water and soil is in the state of Iowa. That is true, but such title is held in *trust* for navigation and commerce and other public uses. To contend that such title is in trust for the people of Iowa as tenants in common is without the slightest force. And when it is said that the state holds such title in trust, the word "state" is as was defined in the great case of Texas v. White, 7 Wall. 700, 19 L. Ed. 227. The state has no proprietary ownership, but the title and holdings are in trust for public uses—navigation, fisheries, and other public uses.

Much was said in argument as to the riparian rights. In this case the Power Company holds the legal title in fee to the soil at the shore place of these structures, and for a long distance up the river on each side. And since the year 1874 (Code 1897, § 2032), it has been the legislative policy of Iowa to allow the fee owners of adjacent shore lands to build piers, cribs, "and other convenient erections" to be used in connection with navigation and commerce. But the riparian proprietor only owns to high-water mark. Hall v. Hobart, 186 Fed. 426, 108 C. C. A. 348 (Circuit Court of Appeals, Eighth Circuit); Steele v. Sanchez, 72 Iowa, 65, 67, 33 N. W. 366, 2 Am. St. Rep. 233; Musser v. Hershey, 42 Iowa, 356; Grant v. Davenport, 18 Iowa, 179, 185; McManus v. Carmichael, 3 Iowa, 1.

At the common law no stream above tidewater was navigable in law. But the question was otherwise settled as to this country in 1851 by the Supreme Court in the case of Genesee Chief, 12 How. 443, 13 L. Ed. 1058, and from that day to this the conclusion therein reached has been followed by all American courts, state and national. If a stream is navigable in fact, it is navigable in law. And the Mississippi river is not only navigable both in fact and law, but is navigable for 2,000 miles, more than one-fourth of which is between Keokuk and St. Paul. And it is equally true that Congress, and Congress alone, has the supreme control thereof, because it is a navigable stream, and because its commerce is interstate and foreign. Philadelphia v. Stimson, Secretary of War, 223 U. S. 605, 635, 32 Sup. Ct. 340, 56 L. Ed. 570; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; United States v. Rio Grande, 174 U. S. 690, 19 Sup. Ct. 770, 43 L. Ed. 1136. And such has been the uniform holdings, with the single exception, allowing the states to act, as held in the famous case of the Black Bird Creek, 2 Pet. 245, 7 L. Ed. 412, and subsequent like cases, as to matters of local concern only, until Congress takes action.

And the legislative declarations have been equally emphatic. The ordinance of 1787 recognized it. The Spanish Treaty of 1795 so declared. The enabling act for the territory of Orleans to form a state,

of February 20, 1811 (chapter 21, 2 Stat. 641), declared that the Mississippi river "shall be a common highway and forever free." The act admitting Louisiana as a state (Act April 8, 1812, c. 50, § 1, 2 Stat. 703) so declared, the act forming Missouri as a territory (Act June 4, 1812, c. 95, § 15, 2 Stat. 747), and the later act admitting Missouri as a state (Act March 6, 1820, c. 22, § 2, 3 Stat. 545, 546), likewise declared. The statute for the survey and sale of public lands (May 18, 1796, c. 29, § 9, 1 Stat. 468) declared that the navigable waters shall remain public highways. And the same is true as to all the enactments forming the territories, and admitting the states of Illinois, Wisconsin, Minnesota, and Iowa. So that from any view, this river is peculiarly and solely under the power and control of the nation, and the nation can and does act only through Congress, acting either directly or by and through powers delegated. And it is for neither Iowa nor Illinois, and much less an individual, to in the slightest degree attempt to control navigation or commerce on this river. And Congress never has attempted to limit or burden navigation on the river, with but one exception, and that exception is in the interest of interstate commerce by land. When the first bridge across this river (Davenport and Rock Island) was provided for, the owners of steamboats combined to prevent its building, insisting that they had the monopoly of the free use of the river, and that the bridge piers, and draws would delay them, and add to the hazards. But that eminent equity judge and scholar in constitutional law, Judge Love, who so long presided in this court, adopted the argument and phrasing of Abraham Lincoln representing the railway company, and held that interstate commerce should be free "across" as well as "lengthwise" the river. And see United States v. Railroad Bridge Co., 6 McLean, 517, Fed. Cas. No. 16,114. And now we have near 20 bridges across this river, all built with the "assent" or "authority" of Congress, and all built under the supervision of the Secretary of War or other designated officer, but all built so as to place the lightest possible burden on the commerce of the river.

[2] Hagerla contends by counsel that this dam, the lock, etc., were not commenced as soon as required by Iowa statute, Iowa Code, § 1994. But conditions subsequent are never self-forfeiting, but are grounds only for declarations of forfeiture by the power which makes the grant. And if a declaration of forfeiture by the granting power is delayed, then the grant as originally made will remain in force until such forfeiture is lawfully declared. A citation of authorities to support this elementary statement is unnecessary. Aside from that, it is never within the rights or power of an individual to raise a state or governmental question as to excess of power. Kerfoot v. Farmers' Bank, 218 U. S. 281, 31 Sup. Ct. 14, 54 L. Ed. 1042; C., B. & Q. R. R. v. Lewis, 53 Iowa, 101, 4 N. W. 842; National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188; Silver Lake Bank v. North, 4 Johns. Ch. (N. Y.) 370, by Chancellor Kent.

[3] In this case Congress by enactment provided for the improvements in 1905. Work visible to all was actually commenced on the ground in January, 1910. Newspapers of the vicinity had had many detailed accounts, with reference to the project. Thousands of men

were employed in and about the works. Hundreds of landowners, many of them neighbors of Hagerla, had sold their lands which would be overflowed to the Power Company. Hagerla had gone into the Illinois courts (September 30, 1911) to enjoin the prosecution of the enterprise, which action voluntarily by Hagerla awaits this case. In the meantime the Power Company had expended millions of dollars. He made no protest as to lack of authority of the Power Company to take by condemnation proceedings, but, on the contrary, negotiated to have a price fixed by agreement. He awaited the action of the sheriff's jury. He was disappointed as to the amount of the award. He then appealed, by which he elected to adopt the remedy at law to have damages assessed. And then on appeal, after first claiming he was entitled to a larger award, for the first time challenged the power to thus take his land, excepting at a price to be named by him alone, and not by negotiations, nor by judicial award. He then did not ask for a temporary injunction. This is not equitable. These acts are within the doctrine of laches. It is now too late for him to be heard on the question of power. New York v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Abraham v. Ordway, 158 U. S. 416, 15 Sup. Ct. 894, 39 L. Ed. 1036; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; Bliss v. Anaconda (C. C.) 167 Fed. 342 et seq.; Penrhyn v. Granville, 181 N. Y. 80, 73 N. E. 566, 2 Ann. Cas. 782.

The period of the statute of limitations is not the sole test. Mere time is not of itself controlling. But if investments are about being made, and the status of the parties changing, a complaining party must act promptly before a court of equity will give attention to an alleged wrong. Such is the rule as uniformly stated by the text-books and authorities.

[4] The question as to the removal of this case has again been argued. If Hagerla had stood on his motion to remand, it might still be a live question. But after this court had denied his motion to remand, he and the Power Company signed and filed in the case a stipulation as to time for pleading. He filed a motion to withdraw his cross-petition, and later withdrew his motion. Still later Hagerla filed an amended bill setting out his case with most elaborate detail, with all the particularity of an original bill in equity with the prayer included. Instead of filing a general replication, he then filed a motion to have the case heard on bill and answer. The Power Company accepted the issues thus tendered, and the court has taken the submission of the case on such issues. Hagerla is a citizen of this district, and the Power Company is a corporation of Maine. Besides, a federal question is presented by the bill. The jurisdictional amount is involved. It is an action of a civil nature. Therefore this proceeding has all the requirements of an original bill, in which he invokes the powers of this court sitting on the equity side of the docket. Any and all that occurred in the state court can be taken for naught, and the case can stand as it does stand on the pleadings filed in this court, vesting this court with all its powers, so that it is immaterial what was done as to the removal or motion to remand.

[5] The title of the act is "granting" the right to construct and

maintain the dam. Section 1 of the statute recites that the "assent" of Congress is given. Whether the word "assent" is as though the word "authorize" had been used, has been in this case the subject of much discussion. It is worthy of but little consideration in my opinion, other than to state that the statute as a whole shows what Congress had in mind, and what Congress attempted to do. And that the statute must be read in its entirety falls within an elementary rule for the construction of statutes. The statute as a whole, with the acceptance by the company, makes a contract. With reference to bridges and other structures on or across navigable waters, in all the statutes for many years, those enacted both before and since the act of Congress in question, Congress has used the words "assent" and "consent" and "authorize" and "empower" indiscriminately, as though synonyms of the same and like meaning. Such is the fact, and it is unnecessary to schedule these statutes. Not only so, but the act of Congress approved June 29, 1906 (chapter 3628, 34 Stat. 632 [U. S. Comp. St. Supp. 1911, pp. 1543, 1544]), amending an act approved May 16, 1906 (chapter 2465, 34 Stat. 196), following the report No. 4,945 of the Committee on Rivers and Harbors, House of Representatives, Fifty-Ninth Congress, First Session, and the act of Congress approved June 23, 1910 (chapter 360, 36 Stat. 593 [U. S. Comp. St. Supp. 1911, p. 1559]), all show most clearly that the word "assent" has received the legislative construction and means the same as though the word "authorize" or "empower" had been used.

[6] The state of Iowa, through the proper officers, acting under a valid statute, admitted the Power Company, a corporation of Maine, to come into the state to transact the very business now questioned, namely, to construct the dam, power house, lock, and dry dock, and expend millions of dollars therefor. The state extended such invitation, granted the entrance into the state, and accepted the statutory license fee. Coming into the state, paying the fees, and obtaining permit from the Secretary of State is expressly authorized by section 1637 of the Iowa Code. Section 1638 provides:

"No foreign corporation which has not in good faith complied with the provisions of this chapter and taken out a permit shall possess the right to exercise the power of eminent domain * * * until it has so complied herewith and taken out such permit."

So that this Power Company, having complied with the statute, had all the rights to remain in Iowa, built its structure, at least from the Iowa shore to the thread of the stream, and was given the power of eminent domain, and to take lands by purchase. Now to drive it from the state and render useless such improvements and such expenditures would be in violation of the clause of the Constitution prohibiting the impairment of contracts. American Smelting Co. v. Colorado, 204 U. S. 103, 27 Sup. Ct. 198, 51 L. Ed. 393, 9 Ann. Cas. 978.

[7] Southern Bridge v. Stone, 174 Mo. 1, 73 S. W. 453, 63 L. R. A. 301, holds that a foreign corporation without the power of eminent domain in the state of its creation may exercise such power in the state where the property is situated, if the statutes of such state vest the power in a foreign corporation. So that it is not material whether the

constructing company under the laws of Illinois or Maine have such power.

There are three questions, which, if affirmatively decided, give the Power Company the power of eminent domain, as stated by the Circuit Court of Appeals for this circuit in Foltz v. Railroad, 60 Fed. 316, 319, 8 C. C. A. 635, 638, Judge Sanborn writing the opinion:

(1) Has the corporation legal capacity to exercise the power of eminent domain?

(2) Is it necessary for the corporation to take the land it seeks to condemn?

(3) Does it seek it for a public use?

[8] Section 1 of the act of Congress of February 9, 1905, provides that the Power Company shall make compensation for all lands that may be taken, overflowed, or damaged by the construction, maintenance, and operation of said works, in accordance with the laws of the state where such lands or other property may be situate.

Section 1990 of the Iowa Code, being a part of title 10 thereof, provides that any person or corporation organized for the purpose of utilizing any water power within the state or any streams lying upon the borders thereof may take and hold so much real estate as may be necessary for the location, construction, and convenient use for the means employed in the utilization of such water power and for the construction of such buildings and appurtenances as may be required. But compensation shall be made for the lands so taken, in the manner provided for taking private property for the works of internal improvement.

When the Constitution was adopted empowering Congress to regulate commerce between the states, with foreign nations, and with Indian tribes, the then existing evil sought to be remedied was as to the commerce carried between Connecticut and New York, and between some of the other states, which commerce was carried in part by small boats, but largely by wagon. The commerce consisted largely of vegetables and cordwood. The steam engine had but recently been invented, and railroads were not to be known for about 30 years. Steamboats were not to be known for nearly 20 years, and so wise a man as Chancellor Kent reached the erroneous conclusion in the great case of Ogden v. Gibbons, 4 Johns. Ch. 150, that steamboats did not come within the constitutional provision when carrying commerce between the states. Electricity was unknown except as demonstrated by Franklin with his kite, followed by the lightning rod. The text-books on the subject of natural philosophy or physics as then used, and continued in use until within the last 40 years, devoted less than two pages to the subject of electricity, and could suggest no utility therefor other than the lightning rod, and defining electricity as "a very subtle and unknown agency." Later came the telegraph, consisting of a pressure at one end of the wire and with breaks on such pressure, forming the Morse alphabet at the other end of the wire. Morse Telegraph Case, 15 How. 62, 14 L. Ed. 601 (1853). When such pressure is over and beyond the state line, it is an interstate commerce, and a foreign corporation doing a telegraph

business cannot be denied admission to or excluded from the state, nor subjected to burdens by the state. Western Union Telegraph Co. v. Kansas, 216 U. S. 1, 30 Sup. Ct. 190, 54 L. Ed. 355. Then came the telephone, then the wireless telegraph, and now we have 1,500,000 horse power in the United States created by the electric current generated by water power, with many millions to follow, if waterfalls now useless are conserved. The pressure and carrying of such current is surely a commerce, as much so as the pressure and carrying of telegrams or natural gas by pipe line. And it has been held by the Supreme Court that natural gas when reduced to possession is a subject of commerce, and a state statute which provides that such gas shall not be carried by means of pipe line beyond the limits of the state is repugnant to the commerce clause and therefore void. Oklahoma v. Kansas Gas Co., 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716.

From this it seems to follow that the pressure of the electric current from this power house into Illinois and Missouri will be regarded by the courts as interstate commerce, and as such to be regulated only by Congress, either by action or nonaction, and that the state of Iowa will be without any power in the matter. It has been the boast of both the courts and the legal profession that the courts keep pace as civilization advances, and methods of business change, and new inventions are brought about. And it will be a reproach to our jurisprudence if the courts fail to keep in touch with the advancement made as to the use of the electric current. The power in question will be approximately 300,000 horse power and fully equal to 200,000 at the end of the line 200 miles distant; the difference being on account of leakage by reason of climatic conditions and the size of the copper or aluminum wire which may be commercially obtainable. This means the saving of 12 tons of coal per year by steam for every water horse power—equal to three times that used in manufacturing in Iowa, more than is now used in the state of Missouri, and one-third of what is used in the state of Illinois, including the city of Chicago, as is gathered from the last census reports. Until recently this power has gone to waste. This is not theoretical conservation of natural resources of which we hear so much, but is conservation of the practical kind that ought to appeal to every thinking man.

A statutory declaration declares the necessity, but as of course is not conclusive on the courts, as to whether such use is a public use within the meaning of the Constitution. The commerce clause, the clause as to the impairment of contracts, the clause as to ex post facto laws, the clause as to pardons, have all been construed by the Supreme Court, not as understood when the Constitution was adopted, but as understood when time for action arises. And it is utterly illogical, and some will say absurd, to construe the words "public use" as applied to taking of private property, by defining those words as relating to utilities in use in the year 1787.

[9] The articles of incorporation of the Keokuk & Hamilton Water Power Company, to which the grant of power was made by the act of Congress in question, specifically authorized that company to construct the works. Section 1 of the statute expressly granted such

rights to that company, its successors and *assigns*. A sale, transfer, and assignment was made by that company to the Power Company now constructing said improvements, and which company is the party to the record herein. And the articles of incorporation of this company authorized it to build the dam, the lock and dry dock, and power house, and to operate the same. Section 1637 et seq. of the Iowa Code provides for a foreign corporation, such as this company is, to enter the state, to transact business, and to exercise the power of eminent domain, and all the powers with all the rights of an Iowa corporation. It is true that a manufacturing corporation is excluded from the terms of the statute. But by both the letter and the spirit of the term "manufacturing" it does not apply to this company. This is so because it is to generate electricity, and not to manufacture any product. Another reason is that, so far as the government is concerned, the purpose is to deepen the waters for navigation and make one lock answer for three locks, and that one lock much larger than all of the former three, and to save nearly two hours of time for boats in making the trip. Still another reason is that the Iowa Secretary of State, empowered to pass on the question, construed the statute in favor of the company, accepted the fees, and granted the permit. So that I conclude that the Power Company has the legal capacity to exercise the power of eminent domain if the other two requisites exist.

The physical fact that water seeks a level subjects Hagerla's land to overflow by the building of this dam and maintaining the water on a level with the 119 gates at the arches. So that we have a "taking" under the holding in the Lynah Case, 188 U. S. 445, 23 Sup. Ct. 349, 47 L. Ed. 539, and it is not only necessary, but not to be avoided, that Hagerla's land be submerged. The question of power is a judicial one, but the question of necessity is a legislative question. Kaw Valley v. Metropolitan, 186 Fed. 315, 108 C. C. A. 393 (Circuit Court of Appeals, Eighth Circuit).

The procedure for taking Hagerla's land was that which is provided for in the statute of Iowa of which section 1637 is a part. Hagerla, although duly served with notice thereof, made no objection to such procedure until the amount of the award was made known. He then recognized it by taking an appeal therefrom. The Iowa statutes as respects taking of private property for public use, such as constructing ditches, straightening and widening streams, providing for railroad right of way, for court and schoolhouses, constructing waterworks, cities taking over system of waterworks, gasworks, and other public utilities, cemeteries, highways, and perhaps other public uses, provide for the appointment of a commission commonly called a jury, in some instances of one man, in other instances three men, in still others six, and still others twelve men. Such awards thus made, while only preliminary, are final and binding unless there is an appeal. But in every instance to meet the requirements of the Iowa Constitution in such cases of taking private property for a public use, an appeal is allowed the party feeling aggrieved to the district court of the county—a court provided for by the Constitution, in which court either party on demand is given the right of a trial to a common-law jury of 12 men,

such a jury as is meant by the Iowa Constitution when the right of trial by jury is given. So that I am of the opinion that the matter of procedure prior to the time the case is lodged in the district court on appeal is not at all pivotal or decisive. It is all in the nature of a process to secure the parties a trial in the district court with the aid of a jury. This is illustrated by the Cincinnati post office case of Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449.

A statutory declaration in any given case authorizing the taking of property for a public use, while not binding, is persuasive, unless clearly and without doubt it is beyond the Constitution. Whether this property will be subject to state and municipal taxation is not before the court. Possibly (but not deciding the question), because a governmental agency, these improvements cannot be taxed, nor levied upon by writ of attachment or execution against the Power Company. But all this is here of little importance, for the reason that this is a court of equity with power to require, on a showing, an additional deposit to be placed in the registry of this court, or a bond with surety to meet any award that in the end may be given Hagerla for his land. The authorities show this work as one for public use. Carothers v. Philadelphia, 118 Pa. 468, 12 Atl. 314; Helena Power Co. v. Spratt, 35 Mont. 108, 88 Pac. 773, 8 L. R. A. (N. S.) 567, 10 Ann. Cas. 1055; Hollister v. State, 9 Idaho, 8, 71 Pac. 541; Gas Light v. Richardson, 63 Barb. (N. Y.) 437; Dodge v. Council Bluffs, 57 Iowa, 560, 10 N. W. 886, holding that a foreign corporation had the power of eminent domain in the construction of waterworks under ordinance of the city. A statute of Wisconsin was enacted to improve navigation and to create hydraulic power for sale. It was held that the company building it had the power of eminent domain, it being for a public use. In re Southern Co., 140 Wis. 245, 122 N. W. 801. In Walker v. Shasta Power Co., 160 Fed. 856, 87 C. C. A. 660, 19 L. R. A. (N. S.) 725 (C. C. A. Ninth Circuit), it was held that in building a ditch and a flume to convey water in furnishing electricity to the public generally for lighting, power, and heating purposes, gives the right of eminent domain.

Sisson v. Board of Supervisors, 128 Iowa, 442, 104 N. W. 454, 70 L. R. A. 440, holds that private property may be taken in connection with a ditch constructed to drain agricultural lands.

In Head v. Amoskeag, 113 U. S. 9, 5 Sup. Ct. 441, 28 L. Ed. 889, it was held that a state statute authorizing a person to erect on his own land a mill and dam across a stream not navigable, paying to the owners of the land overflowed, was the taking of property by due process of law. The holding of the court on the facts in the case and the authorities cited is strongly applicable to the case at bar.

Strickley v. Highland Boy, 200 U. S. 527, 26 Sup. Ct. 301, 50 L. Ed. 581, 4 Ann. Cas. 1174, sustained the Supreme Court of Utah (28 Utah, 215, 78 Pac. 296, 1 L. R. A. [N. S.] 976, 107 Am. St. Rep. 711, 3 Ann. Cas. 1110), in holding that private property could be taken under the power of eminent domain for a right of way for a bucket line across the property of another in carrying ores from the mountain to a railroad station.

In Hollister v. State, 9 Idaho, 8, 71 Pac. 541, the Supreme Court of Idaho held that the power of eminent domain is given to obtain lands for the improvement of water power in which the power is to generate electricity for light and power.

These cases and cases therein cited show that the power of eminent domain has been lawfully exercised in a variety of cases, such as ditching and for irrigation and to aid in mining, straightening streams, widening and deepening channels, and perhaps in other instances, showing thereby that the courts are keeping pace with the progress of our institutions and improved facilities for business.

But a much broader view than the foregoing should be and is taken in the decision of this case. This dam, lock, power house, and dry dock all in combination is one solid mass of concrete work extending from the Illinois to the Iowa shore. No one of the four can be segregated from the other three without destroying all four. So far as the government is concerned, they are all to deepen the channel of the Mississippi river for 60 miles, including the Des Moines rapids, and are all for the benefit of navigation on a navigable stream. The Power Company owns all the shore lands from the dam above to quite a distance on both sides of the river, and therefore it is the Power Company which has the riparian right under the Iowa statute, as maintained by the Iowa Supreme Court in the cases hereinbefore cited. And it is for the national Congress and it alone to enact legislation for the improvement of navigation on this river, and its discretion or wisdom is to be questioned by no party and by no court. Legislation by Congress is supreme. Union Bridge v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523; Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126; Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; Eldredge v. Trezevant, 160 U. S. 452, 16 Sup. Ct. 345, 40 L. Ed. 490; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; South Carolina v. Georgia, 93 U. S. 4, 23 L. Ed. 782.

And it is for the executive and administrative officers of the general government to execute such laws without hindrance by any individual or by any court, state or national. The contemporaneous action by committees of Congress and administrative officers judicially noticed by this court all warrant the statement that this enterprise is one of a national character subject only to the legislation of Congress and made effective by government officers. There can be no logical answer made to the opinion of the court in the case of Stockton, Attorney General of New Jersey, v. Baltimore & New York R. R. (C. C.) 32 Fed. 9, in which the opinion was written by Justice Bradley, Associate Justice of the United States Supreme Court, when holding court on the circuit, in what is known as the Arthur Kill Case. It is to be regretted that the Supreme Court was not enabled to redetermine that case. The records show that the state of New Jersey filed this case in the Supreme Court on appeal, but later on with the leave of the court on motion of the state of New Jersey the appeal was dismissed. But this decision is entitled to great weight, because of the strong reasoning in the opinion, and because of the great learning of Justice Bradley, and

the still further fact that he it was who wrote the opinion concurred in by the entire court in the case of Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224. Justice Bradley's opinion in 32 Fed. 9, is cited with approval in Luxton v. North River, 153 U. S. 532, 14 Sup. Ct. 891, 38 L. Ed. 808.

In the case at bar the action in effect is to enjoin on final hearing the completion of the lock and dry dock for the use of the government, and restore the old and tortuous canal with its three locks and the canal with a depth of water of but five feet, and, if completed before final hearing, to abate not simply the dam, but the lock and dry dock and deepened channel as a nuisance.

The milldam acts have quite generally been held as constitutional as conferring the power of eminent domain. Otis v. Ludlow, 186 Mass. 89, 70 N. E. 1009, 104 Am. St. Rep. 563; Burnham v. Thompson, 35 Iowa, 421; Occum v. Sprague, 35 Conn. 496; Todd v. Austin, 34 Conn. 78; Boston v. Newman, 12 Pick (Mass.) 467, 23 Am. Dec. 622; Hankins v. Lawrence, 8 Blackf. (Ind.) 266; Scudder v. Trenton, 1 N. J. Eq. 694, 23 Am. Dec. 756. Although in the latter case the statute was sustained by giving the parties damage and action therefor without conceding that it had the right of eminent domain.

In the case of Head v. Amoskeag, 113 U. S. 9, 17, 5 Sup. Ct. 441, 28 L. Ed. 889, on writ of error to the Supreme Court of New Hampshire, the opinion collects the statutes of the various states and the decisions thereunder. The opinion recites the fact that no one of these many statutes has been held invalid, until since the year 1870, and then only in three states.

Hagerla's counsel in effect concede the constitutionality of the milldam statutes of most of the states, Iowa included, but claim that th y are not an authority here because, as is insisted, the owner of t' , mill must submit to rates of toll as prescribed by public authority, , n( must serve all comers alike and without preference. The holding ' the Iowa Supreme Court that milldam sites and overflows therefroi :an be established by the power of eminent domain is binding on I ed States courts. Hairston v. Danville, 208 U. S. 598, 28 Sup. Ct. 3 52 L. Ed. 637, 13 Ann. Cas. 1008. But the Iowa Code, section 4, under which this proceeding was instituted, among other things rovides:

"The hts, powers and privileges conferred by this chapter shall be at all times s ect to legislative control."

Hage makes no showing that his land to be submerged has any value ot r than the money value. The showing affirmatively made is that th Power Company will pay any award which may be judicially establi ed. And this court will see to it that this is done. It therefore follo s that to enjoin this work or to abate it as a nuisance will subject th Power Company to millions of dollars of expense, and deny the g vernment the rights of an improved navigation. But to deny Hage i his contention, and allow these improvements to go on and be ope ted, gives Hagerla full compensation, and harms him in no sense wl tever. He has a plain, complete, and adequate remedy at law and i not entitled to relief in equity. The case of New York

City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, is in point on many questions in this case and decisive of them, and is of itself of sufficient authority for a holding adverse to Hagerla. To grant Hagerla the writ of injunction would be a holding that he could use the writ and dictate terms of a hundred or even a thousand more times in amount as to the value of his land. "While we do not mean to intimate that the plaintiff would make an extortionate demand, we do hold that equity will not place them in a position where they can enforce one." Justice Brewer speaking for the court in New York v. Pine, 185 U. S. 93, 98, 22 Sup. Ct. 592, 594 (46 L. Ed. 820), supra. The writ of injunction is not allowed as a club, but is only allowed in furtherance of good conscience, and to protect a party in a right for which a court of law does not furnish an adequate remedy.

The authorities, cases, statutes, reports of congressional committees, and acts of executive and administrative officers with reference to this dam, and kindred subjects, if reviewed, would fill a volume. This opinion will not be further extended, except to state:

[10] This case can be correctly decided on the following statement: Congress is supreme as to the plans and methods for the improvements of navigation on this river. Whether Congress acts wisely or unwisely, its acts are not to be challenged by any court, officer, or person. Congress could have provided for this dam and the lock and dry dock precisely as being built, and with a power house to light and operate the dry dock and lock, and pay the Power Company therefor out of the public treasury. Instead of doing that, payment is to be made by allowing the Power Company the momentary use of the overflow water. In the one case, as in the other, Hagerla's land is taken. So that this entire record presents the academic question as to how the government is to pay for an improved navigation for 60 miles. And the manner of payment does not concern Hagerla, provided he is paid the value of his land. That he will receive in money the full value of his land is not in doubt.

His bill of complaint and amendments should be dismissed with prejudice. Such will be the decree.